# FOR PUBLICATION

**FILED & ENTERED**

**DEC 19 2013**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY penning   DEPUTY CLERK**

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>MODTECH HOLDINGS, INC.,<br><br><br><br>Debtor.<br>――――――――――――――――<br>ALBERTA P. STAHL, in her capacity as the chapter 7 trustee for the bankruptcy estate of MODTECH HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br><br>WHELAN ELECTRIC, INC., a California corporation,<br><br><br>Defendant. | CHAPTER 7<br><br>Case No.:  2:11-bk-14350-TD<br>Adv. No.:  2:11-ap-01432-TD<br><br>**MEMORANDUM DECISION AFTER TRIAL**<br><br><br><br>Trial:  September 27, 2013<br>Courtroom: 1345<br>Time:  9:00 a.m. |

### INTRODUCTION

Plaintiff Alberta P. Stahl, in her capacity as the chapter 7 trustee for the

bankruptcy estate of Modtech Holdings, Inc. (Modtech or Debtor), seeks to avoid

alleged preferential transfers made to Whelan Electric, Inc. (Defendant or Whelan).

At the time of the transfers, Modtech was a contractor for various California school

districts.  Modtech subcontracted with Defendant to provide work, labor and materials

to projects for the Palos Verdes Unified School District (Palos Verdes), the Vista Dual

Magnet School (Vista Dual) and the Los Angeles Community College (LACC)

(collectively, Projects).  On October 2, 2008, Defendant received a $75,000 check

from Modtech.  In addition, Defendant executed and served various stop notices on

the Projects and issued several releases of the stop notices in the ninety days prior to

Modtech's filing.  Modtech filed for bankruptcy on October 20, 2008 (Petition Date).

Plaintiff asserts that Defendant received avoidable preferential transfers on

October 2, 2008 that should be avoided pursuant to 11 U.S.C. § 547(b).[1]  Defendant

argues in opposition that the $75,000 payment was received in the ordinary course of

business and as an exchange for new value furnished to Modtech by Defendant, an

exceptions to rule based upon preferential transfer upon § § 547(g) and 547(c)(1),

(c)(2) and (c)(4).

Trial was by written declaration and documentation submitted pursuant to a

Joint Pretrial Order (JPO) entered on February 14, 2012, with the written consent of

both parties.  There was no live testimony or cross-examination of any witness.  Both

sides submitted briefs to the court.  Plaintiff filed written evidentiary objections to the

Lee Whelan declaration and accompanying trial exhibits.  At trial, Plaintiff waived

cross-examination of Lee Whelan concerning his written testimony and documentary

evidence.  Both sides presented closing statements. The court did not grant Plaintiff's

evidentiary objections, either to the declaration of Lee Whelan, Defendant's

---

[1] All statutory references are to Title 11 of the United States Code unless otherwise stated.

president, or to Defendant's trial exhibits.  The court hereby expressly overrules those objections.  The court's findings and conclusions follow based on the record.

## PLAINTIFF'S ASSERTIONS

Plaintiff asserts two separate categories of preferential transfers.  The first was $75,000 cash paid by Modtech to Defendant in early October 2008.  Plaintiff alleges that the $75,000 was transferred (1) for the benefit of Defendant, (2) on account of antecedent debt owed to Defendant, (3) while Modtech was insolvent, (4) in the 90 days prior to Modtech's bankruptcy, and that (5) Defendant obtained as a result more than it would have if the case had been filed under chapter 7 and the transfer had not been made, as a "preference" as defined in § 547(b).

Second, Plaintiff identifies three stop notices served by Defendant, the first on the Vista Dual project for $134,936.16, on August 21, 2008, and the second and third on the Palos Verdes and LACC projects for $48,000.00 and $85,803.00, respectively, served on October 15, 2008.  Plaintiff alleges that the stop notices operated as liens obtained against the unexpended balance of construction funds and accordingly constituted transfers of an interest in Modtech's property that also fulfill the requirements of § 547(b).

## DEFENDANT'S RESPONSE

Defendant rejects Plaintiff's categorization of both the funds and the stop notices as preferential transfers.  First, Defendant argues that Plaintiff failed to show that the $75,000 payment caused Whelan to receive a larger share of the estate than if the transfer had not been made.  Rather, Defendant asserts that its additional labor,

1   equipment and materials Defendant agreed to provide and did provide to Modtech for

2   the Projects after the October 2 payment, but prior to Modtech's Petition Date, were

3   substantially equal in value to the payment received.  Defendant further argues that

4   the payment received in exchange for additional labor, equipment and materials

5   occurred in the ordinary course of business and provided important new value to

6   Modtech and thereby may not be avoided based on § 547(c)(2)(A) and (B) and (c)(4).

7

8         Additionally, Defendant argues that the $75,000 transfer was a

9   contemporaneous exchange for the new value furnished by Defendant under §

10  547(c)(1) because Defendant partially released $20,714.80 of its stop notice for the

11  Vista Dual project and conditionally waived $34,153.40 for the Palos Verdes project

12  at the time of the October 2 payment.  Tr. Exs. F and H.  Defendant asserts that

13  release of these stop notices constituted the release of a priority interest under

14  *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141, 83 S. Ct. 232, 237, 9 L. Ed. 2d 190

15  (1962).  Importantly, Defendant's new value contribution enabled Modtech to

16  complete three public works projects in spite of Modtech's financial distress, and it

17

18  provided new value to the unsecured creditors of the estate by relieving Modtech's

19  surety, Liberty Mutual, of the responsibility to pay the stop notice amounts pursuant to

20  Liberty Mutual's surety agreement with Modtech.

21

22        As to the stop notices themselves, Defendant asserts that the stop notices

23  were served to protect statutory liens and accordingly are exceptions to preference

24  treatment pursuant to § 547(c)(6).  *See* California Civil Code §§ 3103 and 3156–

25

26  3241.[2]

27

28  [2] With respect to the California Civil Code, the California legislature repealed §§ 3103, 3184, 3186 and 3247 in 2010 and replaced these statutes that year with §§ 8044, 9354, 9356, 9358 and 9550.  The scheme of the California public works stop notice law remained essentially unchanged (so far as the

## DISCUSSION

The first issue is whether Plaintiff has met her burden under § 547(g) of demonstrating an avoidable transfer under § 547(b).  The court concludes that Plaintiff has met this burden and has shown that the $75,000 without more would meet requirements for an avoidable transfer under § 547(b).[3]  The second issue is whether Defendant has met its "burden of proving the nonavoidability of a transfer" under § 547(g).  Accordingly, the outcome of this adversary proceeding turns on the validity of Defendant's evidence and legal position in response to Plaintiff's position that the receipt of a $75,000 check by Defendant on October 2, 2008 satisfies the requirements of § 547(b).  The court believes that the Defendant's position is correct: Defendant's receipt of the $75,000 check should be excepted from the provisions of § 547(b) by the evidence and the law pursuant to the provisions of § 547(c).  Thus, the court will focus its discussion on the defenses asserted by Defendant under § 547(c).

### Ordinary Course of Business under § 547(c)(2)

Section 547(c)(2) prevents the trustee from avoiding a transfer "to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was— (A) made in the ordinary course of business or financial affairs of the

---

court has determined), although to the court's recollection, this subject was not addressed by the parties in this adversary proceeding.

[3] Plaintiff has established that the $75,000 payment was a ". . . transfer of an interest of the debtor in property— (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made— (A) on or within 90 days before the date of the filing of the petition . . . and (5) that enables such creditor to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."  § 547(b).

debtor and the transferee; **or** (B) made according to ordinary business terms[.]" §

547(c)(2).  (Emphasis added.)  Section 547(c)(2) was amended in 2005 by the

Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA).[4]  The Ninth

Circuit has not ruled specifically on how the amendment affects the creditor's burden

of proof as to demonstrating these elements.[5]  Previously, the Ninth Circuit (as

required by the statue as then written) looked at the creditor's defense

conjunctively—requiring that both a subjective and objective standard be

demonstrated—opposed to the now disjunctive defenses of the statute.[6] In the

absence of relevant binding authority addressing the evidentiary standard for the

disjunctive defenses of § 547(c), the court will discuss the pre-BAPCPA Ninth Circuit

case law but recognizes that the Defendant need only prove either the subjective *or*

objective standard to establish its defense under the revised statute.

Under the pre-BAPCPA statute, the Ninth Circuit focus was on whether the

incurrence of the debt was ordinary, i.e., whether the debt was incurred by the debtor

in the ordinary course of business.  *See Diamond v. Gemmel Pharm. Grp. (In re*

*Inland Global Med. Grp., Inc*.), 362 B.R. 459, 464 (Bankr. C.D. Cal. 2006).

To meet Ninth Circuit standards for § 547(c)(2)(A) (the subjective test,

---

[4] This section previously read, in part, a trustee may not avoid a transfer "to the extent the transfer was: (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; **and** (C) made according to ordinary business terms."  (Emphasis added.)

[5] The Ninth Circuit addressed a narrow issue as to the amended section of § 547(c)(2) that is not applicable here in *Wood v. Stratos Prod. Dev.* (*In re Ahaza Systems*), 482 F.3d 1118 (9th Cir. 2007).  In *Ahaza*, the Ninth Circuit held that a creditor could establish an ordinary course of business defense under § 547(c)(2) even if the debt in question is a first time transaction between the parties. Since the $75,000 payment in question was not a first time transaction between the parties, this analysis does not affect the court's decision.  *Id.* at 1123–28.

[6] Some legal scholars have noted that "[i]ssues such as the interpretation and weight of pre-BAPCPA caselaw are unresolved as courts struggle to determine whether the objective standard should continue to be interpreted as it was pre-BAPCPA, or whether it should be read in a more expansive light since it has been liberated from its conjunctive counterpart, the subjective standard."  Anthony Kochis, *Defending Against Preferential Transfers Post-BAPCPA*, Mich. Bus. L.J., Spring 2010.

previously § 547(c)(2)(B)) the creditor must demonstrate that the relevant payments were ordinary in relation to past practices between the debtor and the creditor. *Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775, 790 (9th Cir. 2007).  Effectively, this breaks down into two components.  *Id.*  First, the creditor must show a baseline of past practices between itself and the debtor.  *Id.* Second, the creditor must show that the relevant payments were ordinary in relation to these past practices.  *Id.*  This is most commonly done by demonstrating that the relevant payments did not differ from past payments in amount or form, were not the result of unusual collection or payment activities, or did not come as a result of the creditor taking advantage of the debtor's deteriorating financial condition.  *Id. (*citing *Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir.1994)).

The standard for § 547(c)(2)(B) (the objective test, previously § 547(c)(2)(C)) requires that the creditor demonstrate that the relevant payments were ordinary in relation to prevailing business terms.  *In re Healthcentral.com*, 504 F.3d at 791. As before, this effectively breaks down into two components.  *Id.*  First, the creditor must establish the broad range of business terms employed by similarly situated debtors and creditors, including those in financial distress, during the relevant period.  *Id.* Second, the creditor must show that the relevant payments are ordinary in relation to these prevailing business terms.  *Id.*  In general, the court in *Grand Chevrolet* concluded that § 547(c)(2)(C) should not pose a particularly high burden for creditors. *Id.*

As to whether the transaction between the parties was in their ordinary course of business per § 547(c)(2), the declaration of Lee Whelan provides the following relevant testimony.  "In the summer of 2008 Whelan was working on several projects

with Modtech." Lee Whelan Decl. ¶ 4. "In the summer of 2008, Modtech still owed

some outstanding retention on completed projects to Whelan. I kept in regular

contact with Modtech to work out terms for continuing the work of Whelan on the

various projects in the ordinary course of our business." *Id.* "On August 21, 2008,

Whelan filed a stop notice. . . ." *Id.* at ¶ 5. "As a part of my continuing

correspondence with Modtech, Whelan agreed to a partial payment of the amount it

was currently owed on the various projects. . . ." *Id.* at ¶ 6. "As a part of the payment

process for the partial $75,000 payment from Modtech, Whelan executed several

statutory releases, two conditional on progress payment releases and several smaller

unconditional on final releases." *Id.* at ¶ 8. Based on this undisputed evidence, the

court concludes that Defendant has met its burden of demonstrating that the

transaction between the parties on October 2, 2008 occurred in the ordinary course

of business between the Defendant and Modtech.

The next question is whether Defendant has met its burden under the

subjective test. Examining the evidence presented by Defendant, the court

concludes the standard for § 547(2)(c)(A) is not met. Defendant's compendium of

exhibits and the declaration of Lee Whelan do not show a baseline of practices

between Modtech and Defendant prior to the transaction date of October 2, 2008.

Further, without establishing this baseline Defendant cannot and has not shown that

the October 2, 2008 payment was in line with the parties' previous payment practice.

This evidence, however, does establish the requirements for the objective test

under §547(c)(2)(B). The declaration of Lee Whelan provides the following additional

undisputed evidence: "It is customary in the construction industry to provide statutory

releases in return for a payment from the general contractor. It is my understanding

that these types of releases release a portion of the unexpended balance of the construction fund to the general contractor because the releases guarantee to the owner of the project that the subcontractor whose money is being held is actually being paid the money.  It is my further understanding that the releases also release claims against the surety payment bond for the project."  Whelan Decl. at ¶ 7.  "As a part of the payment process for the partial $75,000 payment from Modtech, Whelan executed several statutory releases. . . ."  *Id.* at ¶ 8.  "I was led to believe that Modtech's surety for the project requested that Whelan do so [that is, execute releases of the stop notices]."  *Id.*  "Whelan received the payment from Modtech on October 2, 2008."  *Id.* at ¶ 9.

Based on this undisputed testimony, Defendant has shown that partial payments in exchange for releases of statutory stop notices are ordinary transactions within the construction industry.  Further, Defendant's evidence demonstrates that the $75,000 partial payment on October 2, 2008 in exchange for Whelan's execution of the statutory releases was carried out in a fashion consistent with the norms of the construction industry. [7]  Accordingly, the objective test of § 547 (c)(2)(B) is met and Defendant has met its burden under § 547 (g). [8]  The $75,000 payment is excepted from avoidance under § 547(b); it was a payment made according to ordinary business terms pursuant to § 547(c)(2)(B).

---

[7] *See, e.g.,Cocolat, Inc. v. Fisher Dev. (In re Cocolat, Inc).*, 176 B.R. 540, 550 (Bankr. N.D. Cal. 2005) (holding that the objective test was met and a partial construction payment excepted from avoidance where creditor demonstrated that based on the knowledge of the industry and experience with other firms, that it was customary for mechanics' liens to be recorded if payments were not made on a timely basis and for negotiations to be conducted in light of this practice).

[8] The court makes this evidentiary finding and conclusion in light of the fact that the Defendant's evidence was uncontroverted, and Plaintiff did not cross-examine Whelan as to this testimony at trial while the court overruled Plaintiff's evidentiary objections.

**New Value under § 547(c)(1) and (c)(4)**

The next issue is whether the $75,000 payment is excepted from avoidance under the new value defenses of § 547 (c)(1) and (c)(4).  "New value" is defined in Title 11 to include "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law . . . ."  § 547(a)(2).  As evidence of new value, Defendant submitted the testimony of Lee Whelan, along with spreadsheets, invoices and time sheets reflecting the labor, equipment and materials provided to Modtech between October 2, 2008 and October 20, 2008.  The pretrial record, as the court recalls, indicates that Mr. Whelan exhibited his willingness to back up these spread sheets and time records with original documents.  The total amount billed for Defendant's work, labor and services during that period was $74,376.24.  Whelan Decl., ¶¶ 3 and 10-14; Tr. Exs. A, B, C and D. Defendant also provided copies of the stop notices as well as the related releases. Tr. Exs. E, F, G, and H.[9]  The court will address each new value defense in turn.


   i.   Section 547 (c)(4)

Section 547(c)(4) prevents a trustee from avoiding a transfer: "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor— (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]" §

---

[9] Plaintiff's counsel's closing argument challenge to Defendant's undisputed evidence is unpersuasive under the circumstances of this trial.

547(c)(4).

     To establish a new-value defense under § 547(c)(4) in the Ninth Circuit,

Defendant must show that: (1) it advanced new value to the debtor after the

preferential transfer; (2) that the advance of new value was unsecured; and (3) that

the advance of new value remains unpaid or, if paid, the payment must also be

avoidable.  *Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.)*, 52 F.3d 228, 230 (9th

Cir.1995).

     Defendant has provided testamentary evidence that establishes these

elements. As to the first requirement, that Defendant provided new value after the

preferential transfer, the declaration of Lee Whalen provides the following testimony:

"Whelan received the payment from Modtech on October 2, 2008. . . ."  Lee Whelan

Decl. at ¶ 9.  "On October 4, 2008, Whelan began providing labor, materials,

equipment and services to the then three ongoing projects it had with Modtech."  *Id*.

at ¶ 10.  This testimony is supported by Defendant's invoices beginning on October 2,

2008, the date of the transfer, in its documentary evidence. [10]   Tr. Ex. B.  The

documentary evidence shows new value in the approximate amount of $74,376.24

for labor and materials from October 2, 2008 to the petition date.[11]  Accordingly, this

---

[10] Plaintiff and Defendant dispute the precise date of Modtech's transfer to Defendant, the first date
from which to gauge Defendant's provision of new value.  Plaintiff has argued that the transfer
occurred on the date the check cleared the Modtech's bank, which they argue was October 6, 2008,
as evidenced solely by Modtech's redacted bank statement.  *See* Tr. Ex. 1.  Defendant urged that the
transfer occurred on October 2, 2008, when Defendant received the check.  Whelan Decl. at ¶ 9.
Defendant is correct. In the Ninth Circuit, the transfer is deemed to have occurred when the check was
delivered rather than when the check was honored.  *See Hall-mark Electronics Corp. v. Sims ( In re
Lee)*, 108 F.3d 239, 241 (9th Cir. 1997)(finding that a transfer occurs when check is delivered to
creditor and noting this policy protects creditors, as it treats the check as a cash payment without
requiring creditors to wait for the check to clear, provided that the check clears within ten days (as it
did here by Plaintiff's admission)).
[11] The court notes that one of the invoices is dated the same day as the alleged transfer, October 2,
2008, but the court is satisfied by the information provided in Defendant's closing argument—that
Defendant's date of purchases is not the date the materials were furnished to Modtech as a
contribution to new value; that date came later when Defendant furnished the materials to the

new value provided to Modtech in the form of labor, equipment and materials

occurred *after* the transfer, i.e. delivery, of Modtech's October 2, 2008 check to

Defendant.

The next requirement is that the advance of new value be unsecured. There is

no evidence before the court showing that Defendant was a secured creditor as to

the goods, equipment and services it provided after the transfer date. Moreover,

there is no evidence that Whelan was paid for any work, goods or equipment it

provided Modtech between October 2, 2008 and the Petition Date or has made any

postpetition claim relating thereto other than here, in defense of Plaintiff's preference

claims. Thus, the new value provided Modtech in the amount of $74,376.24 in labor,

equipment and materials appears to be an unsecured debt.

The final element requires that the advance of new value remain unpaid.

Defendant's trial brief unequivocally states that in exchange for the new value it

provided to Modtech, Defendant "received no further payment from Modtech prior to

the petition date." DF Tr. Brief at 3. Defendant's exhibits, specifically Exhibit A, show

an unpaid balance for the new value provided in the form of labor, equipment and

materials from October 2, 2008, to the petition date in the amount of $74,376.24.

Accordingly, the $75,000 transfer on October 2, 2008 is offset by the new value

provided by Defendant to Modtech in the amount of $74,376.24. *In re IRFM, Inc.*, 52

F.3d at 233 (adopting the *Garland* accounting method). Based on this evidence, the

court concludes that Defendant has sufficiently shown that the new value it provided

to Modtech remains unpaid.

Defendant has met its burden under § 547(g) in demonstrating that it provided

---

Projects—which did not occur until October 4, as per the Lee Whelan declaration.

Modtech new value in the amount of $74,376.24 for labor, equipment and materials that have not otherwise been repaid.  The $75,000 preference payment is offset by $74,376.24 in new value, thereby permitting avoidance of only $623.76 at most.  As discussed above, however, the entire $75,000 payment should be excepted from avoidance as a payment in the ordinary course of business under § 547(c)(2)(B).

      ii.     <u>Section 547(c)(1)</u>

Section 547(c)(1) prohibits the trustee from avoiding a preferential transfer to the extent the transfer was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." "New value" for purposes of § 547(c)(1) is measured at the time of the transfer. *Janas v. Marco Crane & Rigging Co. (In re JWJ Contracting Co.)*, 287 B.R. 501, 507 (9th Cir. BAP 2002) (citing *In re Grand Chevrolet, Inc.,* 25 F.3d at 733 (9th Cir.1994), *aff'd*, 371 F.3d 1079 (9th Cir. 2004)).

Whether a transfer constitutes a contemporaneous exchange for new value under § 547(c)(1) raises a subjective question of fact, requiring a "case-by-case inquiry into all relevant circumstances" including the length of time between the issuance of credit (by the debtor) and the exchange of new value (by the creditor), the nature of the transaction, and the intention of the parties.  *See Dye v. Rivera (In re Marino)*, 193 B.R. 907, 913-14 (9th Cir. BAP 1996) (quoting *Pine Top Ins. Co. v. Bank of America Nat'l Trust & Savings Ass'n*, 969 F.2d 321, 328 (7th Cir. 1992)). Furthermore, the Ninth Circuit Bankruptcy Appellate Panel (BAP) has recognized that "[t]he payments made by a general contractor to subcontractors on public works

projects are typically exempted by the contemporaneous exchange exception of §

547(c)(1)."  *In re JWJ Contracting Co.,* 287 B.R. at 507 (citing *O'Rourke v. Coral*

*Constr., Inc. (In re E.R. Fegert, Inc.),* 88 B.R. 258, 259 (9th Cir. BAP 1988)).

    The first issue is whether the transaction between the parties on October 2,

2008 was intended to be a contemporaneous exchange for new value.  The

agreement between Modtech and Defendant can be broken into three parts: (1)

Modtech would provide a partial payment of $75,000 to Whelan; (2) Defendant would

execute releases of the statutory stop notices and; (3) Defendant would continue to

provide labor, equipment and materials on an ongoing basis for Modtech's projects.

The latter portion of the agreement—the promise to provide future goods and

services in exchange for payment —cannot constitute new value at the time of the

transfer.  *See, e.g., Elec. Metal Prod., Inc. v. Bittman (In re Elec. Metal Products,*

*Inc.),* 916 F.2d 1502, 1506 (10th Cir. 1990) (noting that the fact that the creditor may

have promised to continue to do business with the debtor if it paid its bills is not new

credit or new value to the estate)(quotation marks and citation omitted); *see also In re*

*JWJ Contracting Co.,* 287 B.R. at 507 (requiring the court to measure new value *at*

*the time of the transfer*).  Therefore, the question is whether the partial payment of

$75,000 in exchange for releases of the stop notices falls within the ambit of §

547(c)(1).

    At issue here is the October 2, 2008 partial release in the amount of

$20,714.80 on the Vista Dual stop notice served on Modtech on August 21, 2008,

and the conditional waiver and release upon progress payment on the Vista Dual

Project on October 3, 2008. [12]  Tr. Exs. E, F, and H.  As to these releases, Defendant

---

[12] The court only has evidence as to three stop notices: the Vista Dual stop notice, the LACC stop

had the burden to show that (1) the parties intended the transfer of new value to be contemporaneous, (2) the exchange was in fact substantially contemporaneous, and (3) new value was given.  *In re JWJ Contracting Co.,* 287 B.R. at 510.

As to the Vista Dual release, the evidence indicates that Defendant received the $75,000 check from Modtech on October 2, 2008, and also that Defendant signed a Partial Release of Stop Notice for $20,714.80 as to the Vista Dual project on October 2, 2008 and a conditional waiver and release upon progress payment as to the Vista Dual project on October 3, 2008.  As explained above, the date assigned to a transfer by check is the date the check was delivered, or October 2, 2008, not the date the check was debited on Modtech's bank account, or October 6, 2008.[13] Defendant's releases were given in a substantially contemporaneous exchange for the $75,000 check.

Moreover, the evidence establishes the parties' intent that the exchange of the $75,000 check for the releases be substantially contemporaneous and that it was so in fact.  The declaration of Lee Whelan provides the following testimony, "As a part of the payment process for the partial $75,000 payment from Modtech, Whelan executed several statutory releases . . . ." Lee Whelan Decl. ¶ 8.  Thus, Defendant has established intent to, and execution of, a substantially contemporaneous exchange between itself and Modtech.

The issue, however, is whether new value was given in exchange for the

notice, and the Palos Verdes stop notice. Tr. Exs. E and G.  The evidence establishes that the stop notice for the Palos Verdes project and the LACC project, which may have established the surety (or secured) interest vis-a-vis Modtech, were not served until well after October 2; they were served on October 15, 2008.  Defendant cannot claim to have provided new value in the form of the Palos Verdes conditional release before the stop notice was served.  There was no release as to the LACC stop notice.  Accordingly, there was no exchange for the secured benefit Defendant asserts is established under the *Pearlman* decision.

[13] *See supra* text accompanying note 9.

releases of the stop notices.  Plaintiff argues that the releases of the stop notice do not equate to new value because: (1) Defendant failed to show that the Vista Dual Project had any unexpended funds that was equal to or exceeded $20,714.80 and (2) the surety failed to perfect its security interest until after Laurus had established a perfected senior security interest in Debtor's estate, and therefore the surety did not have a "secured" lien.

The genesis of this argument stems from the holding in *Pearlman*, 371 U.S. at 141, where the Supreme Court ruled that a surety had the right to construction funds to reimburse it for monies paid to subcontractors when the general contractor had failed to do so.  *Id.*  The payment of these claims gives the surety an equitable lien on the funds in the construction account that is superior to the debtor's bankruptcy estate.  *Id.*  This holding has been extended in the Ninth Circuit to apply to situations similar to the facts of this case.

In *O'Rourke v. Coral Constr., Inc. (In re E.R. Fegert, Inc.),* 88 B.R. 258, 259 (9th Cir. BAP 1988)(*Fegert I* ) *aff'd*, 887 F.2d 955 (9th Cir. 1989)(*Fegert II*), the debtor was a general contractor engaged in a construction project subject to a surety agreement. *Fegert I*, 88 B.R. at 259. The subcontractors brought suits against the surety, and in exchange for payments made by the debtor the subcontractors released their claims against the surety.  *Id.* The BAP, as affirmed by the Ninth Circuit, found that the release of these claims in exchange for payment constituted new value under § 547(c)(1).  *Id.* at 260. The BAP reasoned that if the debtor had not made the payments to the subcontractors, then the surety would have been required to pay those claims and thereafter exercise its equitable lien rights.  *Id.*  The BAP held, "[u]nder these facts, the release of the subcontractors' rights against the surety,

which in turn could have exercised its lien rights, constituted 'new value' being given in a substantially contemporaneous exchange." *Id.*

Under both *Pearlman* and Ninth Circuit precedent, the relevant inquiry appears to focus on the available unexpended balance of the construction fund at the time of the transfer to determine what equitable rights the surety would have received had the payments been made by the surety.  As to this point, *In re JWJ Contracting Co.,* 287 B.R. 501 (9th Cir. BAP 2002) is instructive.  In *JWJ Contracting Co.*, the BAP examined a number of cases that provide insight into this issue including *Newbery Corp. v. Fireman's Fund Ins. Co.*, 106 B.R. 186 (D. Ariz. 1989), and *Lubman v. C.A. Guard Masonry Contractor, Inc.* (*In re Gem Constr. Corp.*), 262 B.R. 638 (Bankr. E.D. Va. 2000).

In *Newbery*, the court applied but distinguished *Fegert I*, as the *Fegert I* court assumed that there were sufficient identifiable contract proceeds to satisfy the surety's equitable lien.  *Newbery,* 106 B.R. at 187. In the *Newbery* case, some of the contracts bonded by the surety were operating at a loss, resulting in a deficiency between the equitable lien the surety would have received had it made the payments itself and the contract proceeds available to satisfy the equitable lien.  *Id.* at 187-88.  The *Newbery* court concluded that to the extent the surety's equitable lien would have exceeded the amount of the contract proceeds that could be released to pay the equitable lien, that amount would be tantamount to a release of an unsecured indemnity claim and would not constitute new value.  *Id.* at 188.

The BAP also considered the analysis as set forth in *Gem Constr. Corp.* where the court examined how a surety's equitable lien rights might be affected when subcontractor claims against the bond exceed the amount of funds held by the owner

in the unexpended construction fund.  *Gem Constr. Corp.*, 262 B.R. at 650.   In *Gem Constr. Corp.,* the subcontractor claims against the bond ultimately exceeded the amount held by the owner to satisfy those claims, but not all the claims had actually matured at the time of the transfer.  *Id.* at 650-51.  The court reasoned that although at the time of the transfer the debtor owed the other subcontractors $172,958.08, the surety did not have any liability for those debts because the other subcontractors had not made a claim on the bond.  *Id.*at 651.  Thus, at the time of the transfer, the surety could have paid the subcontractor and would have been fully secured on the $81,874.00 payment to the subcontractor.  *Id.* at 652.  Restated, the subcontractor had a matured claim against the surety bond.  *Id.*  Although later claims made against the bond exceeded funds payable to the debtor, the court concluded that the relevant inquiry is the unpaid amount of the surety's contingent claims that have matured into actual liabilities at the time of the transfer.  *Id.* at 651.

Accordingly, the *JWJ Contracting Co.* panel, applying the reasoning from the *Newbery* and *Gem Constr. Corp.* cases, held that when applying *Fegert II* "the appropriate focus is whether the contingent claim of the surety is fully secured. If not, the release of the subcontractor's claim against the bond results in new value for the debtor only to the extent that the surety is secured."  *JWJ Contracting Co.,* 287 B.R. at 513.

Here, Defendant filed, as an attachment to the Declaration of Patricia Teunisse, a letter from Vista Unified School District (Vista Unified) to the Debtor, indicating the district's intent to withhold the amount of Defendant's stop notice plus an additional $20,990.42.  Tr. Second Ex. J.[14]  Applying the Ninth Circuit standard,

---

[14] Teunisse's declaration was allowed in evidence by the court's two orders entered September 17,

Defendant had a claim for $134,936.16 against the bond, as evidenced by the stop

notice dated August 21, 2008.  When Defendant delivered the releases, the

construction fund had sufficient capital to pay the amount of the claim as per the letter

from Vista Unified.  Therefore, on October 2, 2008, had Debtor's surety, Liberty

Mutual, paid Defendant's claim, Liberty Mutual would have had an equitable lien

covered by the amount held in the construction fund.

This accords with the reasoning in *Fegert I*, as there is no evidence before the

court that the Vista Dual construction fund was operating at a loss at the time of the

transfer.  In fact, the evidence shows that the owner, Vista Unified, withheld sufficient

funds in the construction fund to fully secure Liberty Mutual had it made the payment

to Defendant.  Moreover, there is no evidence before the court showing that other

subcontractors had matured claims against the bond such that at the time of the

transfer the Vista Dual construction fund did not have sufficient funds to secure the

hypothetical surety lien.

Further, the effect of Liberty Mutual's failure to file its UCC-1 statement on its

hypothetical equitable lien rights in the construction fund on October 2, 2008, is

seemingly immaterial to this analysis, as the equitable lien arises under *Pearlman*

and other related cases as a common law lien.  As discussed above, the relevant

inquiry examines whether the surety would be hypothetically secured by the amount

held in the construction fund at the time of the transfer given the matured claims

against the bond.  The court has already concluded that the evidence presented in

this case establishes that Liberty Mutual would have been secured by the funds held

---

2012, (1) as a modification of the JPO entered February 14, 2012 and (2) denying Plaintiff's Motion *In
Limine*.

1   by Vista Unified at the time of the transfer.

2       Accordingly, the court concludes that the releases executed provided new

3   value to the estate.  Defendant has met its burden under § 547(g) of demonstrating

4   an exception to avoidance under § 547(c)(1).

5

6

7       **Fixed Statutory Lien under § 547(c)(6)**

8       Section 547(c)(6) states that a trustee cannot avoid a transfer: "that is the

9   fixing of a statutory lien that is not avoidable under section 545 of this title." §

10  547(c)(6).

11

12      Plaintiff has argued that the stop notices served by Defendant on August 21,

13  2008, and October 15, 2008, constitute transfers of interests that are avoidable as

14  preferential transfers in the 90 days before bankruptcy.  Defendant counters that the

15  stop notices are statutory liens that fall under an exception in § 547(c)(6). [15]

16      It is unclear whether § 547(c)(6) is applicable in this case as it appears to

17  involve the avoidance of a payment on a statutory lien rather than avoidance of the

18  actual lien itself. [16]  As explained by the court in *In re Cocolat, Inc.,* 176 B.R. 540, 549

19  (Bankr. N.D. Cal. 1995):

20

21          On its face, § 547(c)(6) does not appear to protect
            preferential transfers of money. It appears to protect only
22          avoidance of statutory liens. Nevertheless, some courts
            have applied this defense to protect payments made to
23          creditors with unavoidable statutory lien rights. As stated
            in *Cimmaron Oil*, 71 B.R. at 1010:
24

25  _____

26  [15] Defendant's assertion of its § 547(c)(6) defense was allowed as an amendment to its Answer.
    [16] Should it be determined that Plaintiff's position is correct that Defendant's stop notices and stop
27  notice releases were themselves "transfers" within the meaning of § 547(b) and therefore avoidable,
    there would be no different outcome here.  If the stop notices were held to be avoidable, it would seem
28  that they drop out of the calculus for deciding the outcome of this adversary proceeding.  If Plaintiff's
    position here is correct with regard to the stop notices, releases and § 547(b)'s application to this
    evidence, Defendant's remaining evidence supports a judgment in favor of Defendant.

Although the language of § 547(c)(6) arguably applies only to the fixing of a lien, the legislative history reflects Congress' intent that § (c)(6) also exempt from the trustee's avoiding power "transfers in satisfaction of such liens." S.Rep. No. 989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5874; H.R.Rep. No. 595, 95th Cong., 1st Sess. 374, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6330.

*See also Nucorp Energy*, 902 F.2d at 733–34 (holding that debtor's payments to contractor were not protected from avoidance by 11 U.S.C. § 547(c)(6) where time to record a mechanics' lien had expired and no lien had been recorded).

Notwithstanding *Cimmaron* and *Nucorp*, the Court is skeptical that the language of § 547(c)(6) should be strained to apply to payments on a statutory lien, rather than the "fixing" of the lien itself.

*In re Cocolat, Inc.,* 176 B.R. at 549.

Assuming, *arguendo*, that § 547(c)(6) applies to protect payments on a statutory lien rather than the avoidance of the lien itself, the court concludes that the stop notices equate to statutory liens that cannot be avoided under § 545. Statutory liens created before the filing of a bankruptcy case or other insolvency proceedings, other than a lien for rent, do not constitute preferential transfers. §§ 545 and 547(c)(6). A statutory lien is defined as a "lien arising solely by force of a statute on specified circumstances or conditions, . . . but does not include security interest or judicial lien . . . ." § 101(53). A stop notice falls within these parameters. *Cf. Klein et al. v. Trovato (In re Lionel Corp.)*, 29 F.3d 88, 94 (2nd Cir. 1994) (finding that mechanic's liens qualify as statutory liens based on the legislative history to § 101(53), as a statutory lien is "one that arises automatically, and is not based on an agreement to give a lien or on judicial action," and mechanics', materialmen's, and warehousemen's liens are examples)(citations omitted)).

Defendant's above-mentioned stop notices were served (before Modtech's bankruptcy) by virtue of California Civil Code §§ 3103 and 3156–3241. Tr. Exs. E, G and H. Accordingly, the court finds and concludes that Defendant's stop notices fall under the exception to preferential transfer found in § 547(c)(6).

## CONCLUSION

Defendant has put forth successful defenses to rebut Plaintiff's claim that the $75,000 check was a preferential transfer that should be avoided under § 547(b). First, Defendant has demonstrated by a preponderance of the evidence that the $75,000 payment was not a preferential transfer based on its defense pursuant to § 547(c)(2). Second, Defendant has demonstrated by a preponderance of the evidence that it provided important new value in releases of the stop notice and money or money's worth in goods and services to Modtech in the amount of approximately $74,376.24 following delivery of the $75,000 but prior to Modtech's bankruptcy filing. Defendant is entitled to exceptions to § 547(b). The October 2 payment should not be avoided based upon § 547(c)(1) and (c)(4) as well.

Under all the circumstances of this inexplicably protracted litigation arising out of Modtech's 2008 demise, it seems to the court that the preponderance of the evidence leads to judgment in favor of Defendant. Judgment will be entered in favor of Defendant, with its costs.

Date: December 19, 2013

Thomas B. Donovan
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): **MEMORANDUM DECISION AFTER TRIAL** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** ʙ Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of (*date*) 12/18/13, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

D Edward Hays on behalf of Plaintiff The Official Committee of Unsecured Creditors
ehays@marshackhays.com, ecfmarshackhays@gmail.com

Judith E Marshack on behalf of Plaintiff The Official Committee of Unsecured Creditors
jmarshack@marshackhays.com, ecfmarshackhays@gmail.com

Judith E Marshack on behalf of Plaintiff Alberta P Stahl Ch 7 Trustee
jmarshack@marshackhays.com, ecfmarshackhays@gmail.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

☐    Service information continued on attached page

**2.    SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

Defendant's Attorneys
Patricia Teunisse
Randall J Pitre
Pitre & Teunisse Inc
921 W Cienega Ave
P.O. Box 186
San Dimas, CA 91773-0186

Defendant
Whelan Electrical, Inc.
244 West Orange Show Lane
San Bernardino, CA 92408

☐    Service information continued on attached page

**3.    TO BE SERVED BY THE LODGING PARTY:** Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐    Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.